IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Senior District Judge Richard P. Matsch

Civil Action No. 07-cv-00541-RPM

NICK ROGERS,
AL ARCHULETA,
WILFRED BELIVEAU,
HARRY BLOODWORTH,
TIMOTHY DELSORDO,
CORY DUNAHUE,
RUSSELL DYMOND, JR.,
ROBERT FREUND,
MICHAEL GABRIELE,
PAUL GOFF,
ALEXANDER M. GOLSTON,
JEFFREY MARTINEZ,
MICHAEL MOSCO,
PHILLIP NEWTON, and
ANDREW RAMIREZ, et al.,

        Plaintiffs,

v.

CITY AND COUNTY OF DENVER, a Colorado Municipal Corporation,
        Defendant.

---

MEMORANDUM OPINION ON MOTIONS FOR SUMMARY JUDGMENT

---

      The Charter of the City and County of Denver ("Denver" or "the City"), a home rule city

under the Colorado Constitution, grants police officers the right to be represented by an

employee organization and bargain collectively for compensation, working hours and other

matters, with specific exclusions. Charter § 9.8.3. The Denver Police Protective Association

("the Association") has been and is such a bargaining agent for officers in positions of classified

-1-

service of the Denver Police Department ("DPD"), except the Chief of Police, Deputy Chiefs,

Division Chiefs, and Commanders. A Collective Bargaining Agreement ("CBA"), effective

January 1, 2005 through December 31, 2007, remains in effect because no new agreement has

been reached.

Article 15 of the CBA reads as follows:

15.1    During each twenty-eight (28) day work period, the normal work cycle shall be one hundred sixty (160) hours, inclusive of authorized leave time. During each twenty-eight (28) day work period, each officer shall receive eight (8) days off, or the equivalent, depending on the officer's regularly scheduled duty shift.

15.2    In the event that the department adopts a fourteenth (14th) period during any calendar year, each officer shall receive an additional (2) days off, or the equivalent, depending on the officer's regularly scheduled duty shift.

Article 16 sets the policy for payment of overtime:

16.1    Pursuant to § 7(k) of the Fair Labor Standards Act (29 U.S.C. § 207(k)), a work period for officers of twenty-eight (28) days is established.

16.2    The overtime rate of pay shall be at time and one-half of the officer's regular rate of pay. Except as noted in section 16.3 below, all officers up to and including the rank of lieutenant shall be paid at the overtime rate for all hours worked in excess of their normal daily work shift or for all hours actually worked in excess of one hundred seventy-one (171) hours in the work period. Captains shall be compensated for all hours worked in excess of their normal duty shift at their base rate of pay, except as noted in section 16.3 below.

All overtime worked other than off-duty overtime specified in section 16.3 below shall be compensated as either money or time off pursuant to this agreement. All overtime work must be approved by the officer's supervisor prior to the work being performed. Time worked will be recorded pursuant to the Department's established record keeping procedures.

After working overtime the officer will designate whether he wants to be compensated in money or time off. If the officer requests compensation in money, that request will be honored unless a supervisor, for reasonable cause, denies the request. Any such denial is subject to review through the chain of command and ultimately through the grievance procedure of the

collective bargaining agreement. If the officer requests compensation in compensatory time off, said request shall be granted, absent extraordinary circumstances, until the officer achieves a bank of eight (80) hours. If an officer has accumulated a bank of eighty (80) hours or more, then a request for further accrual of compensatory time off must be approved by the Chief or his designee.

Upon the request of the officer, compensatory time may be used within a reasonable period after making the request, if the use of compensatory time does not unduly disrupt the operations of the Department. Under all circumstances, pre-approved vacations take precedence over requests to use compensatory time.

16.3    Overtime in off-duty positions paid through the department shall be compensated as follows:

    a.    Officers below the rank of sergeant working overtime in an off-duty position paid through the department shall be compensated at their overtime rate.

    b.    Officers at or above the rank of sergeant working overtime in an off-duty position in a supervisory capacity paid through the department shall be compensated at their overtime rate.

    c.    Unless otherwise approved by the Chief or his designee, officers at or above the rank of sergeant working overtime in an off-duty position in a non-supervisory capacity paid through the department shall be compensated at one and one-half times the hourly rate of pay of a detective with 25 years of longevity.

16.4    Actual overtime worked is to be converted to the nearest 1/10 hour.

Pay rates are set at an annual salary for officers according to rank in Article 27. For 2005, the annual salaries were as follows:[1]

---

[1]The 2005-07 CBA provided for two increases in pay rates, effective January 1, 2006 and January 1, 2007. The rates shown are not current.

| | |
|---|---|
| Police Officer 4th Grade | $39,144 |
| Police Officer 3rd Grade | $43,704 |
| Police Officer 2nd Grade | $47,352 |
| Police Officer 1st Grade | $60,204 |
| Technician | $64,224 |
| Detective | $66,276 |
| Corporal | $66,276 |
| Sergeant | $71,964 |
| Lieutenant | $82,536 |
| Captain | $92,976 |

Longevity pay is provided after 5 years and additional monthly pay is provided for certain duty assignments, such as bomb technicians, motorcycle and bilingual officers.

Article 28 provides for bi-monthly (*sic*) compensation payments by the 15th and last day of each month.[2]

The officers in the bargaining unit are granted sick leave under Article 10 as follows:

10.1    Each officer shall be allowed eighteen (18) days per year of sick leave with full compensation at the officer's base rate of pay. The unused portion of such sick leave may be accumulated until the officer shall have a reserve of ninety (90) days of sick leave. At any time the accumulated reserve of sick leave shall exceed ninety (90) days, salary for the day or days in excess of ninety (90) shall be paid to the officer computed on the basis of eight-hour days at the officer's base rate of pay, provided the Chief approves such payment; and if such payment is not so approved, the days in excess of ninety (90) shall be added to the officer's annual vacation. The maximum amount of accumulated sick leave to be compensated in any one year is eighteen (18) days in excess of a ninety (90) day bank.

Article 11 establishes recognized holidays and 11.2 provides for payment of one and one-half times the base rate of pay for time worked on holidays.

---

[2]Before December 31, 2005, DPD officers were paid twice per month, with paychecks issued on the 15th and the last day of the month. Beginning on January 1, 2006, DPD officers have been paid on a bi-weekly basis, with paychecks issued every other Friday, unless the payday fell on a holiday, in which case paychecks were issued the preceding business day. (Def.'s mot. for summ. j. on pls.' seventh, eighth, ninth and tenth claims for relief [dkt. 112], at 6.)

Under Article 9, officers receive annual vacation time graduated from 96 to 200 hours on five year periods, accruing for each month of service based on seniority.

Definitions relevant to this case are:

2.12 **"Base Pay"** is the sum total of an officer's annual salary plus longevity as calculated in accordance with this Agreement. **"Base Rate of Pay"** is the base pay divided by two thousand eighty (2,080) hours.

2.13 **"Regular Rate of Pay"** is the sum total of an officer's base pay, as defined in 2.12 above, plus any other regularly recurring remunerations the officer may be receiving under Article 27 of this Agreement, divided by two thousand eighty (2,080) hours.

2.14 **"Hourly Rate"** is the annual salary for a given rate, divided by two thousand (2,080) hours.

In this civil action, filed by 16 police officers under the Fair Labor Standards Act , 29 U.S.C. § 201 *et seq*. ("FLSA"), the Plaintiffs seek damages for themselves and others similarly situated for claimed violations of the statutory and regulatory law by failure to pay overtime for work performed, untimely payment of overtime, improper calculation of overtime pay and denial of their right to use accumulated compensatory time off. The plaintiffs did not request a preliminary certification of a collective action under § 216(b) with court approved notification because the Association provided notice and solicited its members to file consents to join as plaintiffs. There have been 856 consents filed. Some have withdrawn and one of the filing plaintiffs, Michael Cody, has withdrawn.

In their amended complaint, filed May 18, 2007, the plaintiffs have alleged 10 claims for relief. Denver has filed three motions for summary judgment seeking dismissal of them for reasons addressing them as separate claims and the plaintiffs filed motions for summary judgment of liability on five of the claims.

In reviewing these motions and the discovery materials submitted by the parties, the court accepts the plaintiffs' position that their case is proceeding as a collective action and the opt-in plaintiffs are included in considering that all of the claims in the amended complaint can be supported by sufficient evidence to make them viable and proper subjects for adjudication.

The legal issues raised by the parties' motions may be addressed at the conceptual level but it is apparent that disposition will require a trial to resolve factual disputes but also to consider the claims in the full context of the operations of the Denver Police Department ("DPD") during the relevant period and the plaintiffs' contentions regarding the culture of inhibition and intimidation to avoid the statutory and regulatory mandates.

The first claim seeks compensation for time spent putting on and taking off the police uniform and equipment required for conducting police activity. For convenience of analysis, this claim is considered as it applies to patrol officers. The DPD Operations Manual prescribes the basic uniform to be worn on duty. It consists of a uniform shirt, uniform trousers, trouser belt, socks and authorized footwear. (DPD Op. Manual § 111.02.) A uniformed officer is generally required to carry a metal badge and nameplate, current DPD identification card, a valid Colorado driver's license, and a standard uniform belt ("duty belt") containing an authorized holster and firearm, ammunition case and ammunition, handcuffs and handcuff case, department issued tear gas and holder, flashlight, baton ring and belt "keepers." (*Id*. § 111.03.) Uniformed officers are not required to wear basic hats or reflective apparel or carry batons, but officers must have those items available at all times. (*Id*. §§ 111.02(1), 111.02(12) & 111.03(13)). The Operations Manual describes particular situations in which basic hats and reflective apparel must be worn. The wearing of ballistic vests is encouraged, but not required. (*Id.* § 111.05(2)(e)).

The DPD does not require that donning and doffing the basic uniform take place at the assigned work station. Some district headquarters have storage lockers and rooms available for use at the officer's individual choice. Some district buildings are too small and the officers must report in full uniform. The City argues that the option to put on and take off the uniform at home or elsewhere distinguishes this case from precedents established in the context of the meat industry and other hazardous occupations.

The option to change away from the duty station is not determinative. The principal activity of the patrol officers is policing the community. The police uniform is not "clothing" in any ordinary sense. It is the visible sign of authority and an essential element of the officer's ability to command compliance with his commands and directives. It is analogous to the judicial robe. The uniform includes the equipment that are the tools that enable the officer to use physical force, including deadly force, for the protection of himself and others as circumstances require.

The City argues that the Plaintiffs' clothes changing activities are excluded from compensation under 29 U.S.C. § 203(o). That section provides:

> Hours Worked.--In determining for the purposes of sections 206 and 207 of this title the hours for which an employee is employed, there shall be excluded any time spent in changing clothes or washing at the beginning or end of each workday which was excluded from measured working time during the week involved by the express terms of or by custom or practice under a bona fide collective-bargaining agreement applicable to the particular employee.

CBAs between the City and the Denver Police Protective Association have been in effect since January 1, 1996. DPD officers have never been compensated for donning and doffing their uniforms and personal equipment. The City contends that this history of non-compensation shows an established custom or practice under the CBAs.

-7-

That argument is not persuasive. Silence in collective bargaining is not the equivalent of a custom or practice of non-compensability.

In December 1985, the United States Department of Labor ("DOL") issued a Wage and Hour Opinion Letter, stating that the time spent by a uniformed police officer donning and doffing the required uniform was not compensable time under the FLSA, where a collective bargaining agreement between a city and the union had no express provision regarding the compensability of clothes-changing time and there had been no custom or practice between the parties to consider such clothes changing time compensable. Wage & Hour Opinion Letter, Dec. 30, 1985, 1985 WL 1087351, Def.'s Ex. A-98. That opinion letter is not persuasive, but may be considered with respect to the issue of willfulness. Similarly, Wage & Hour Advisory Memorandum No. 2006-2 dated May 31, 2006 (opining that changing into gear is not a principal activity if employees have the option and the ability to change at home) is relevant only to the issue of willfulness.

The judicially-created *de minimis* rule provides an exception to the FLSA's requirement that all work be compensated. There are genuine issues of material fact regarding the time and effort required to don and doff the DPD uniform and protective gear. The City's *de minimis* defense is a factual issue for trial.

While donning and doffing the patrol officers uniform and equipment is compensable time under the FLSA as activity that is integral and indispensable to their police duties, the continuous work day does not begin or end with that activity. The plaintiffs are not asking for time spent commuting for those officers who chose to change at home. This ruling is applicable only to the uniformed officers on official duty. The facts concerning wearing uniforms and

equipment during secondary employment are not adequately presented in the papers filed. Similarly there is no clear evidentiary record concerning detectives and other non-uniformed officers.

In claims two through five of the amended complaint, the officers claim that compensation must be paid for four categories of work activity for which no payment has been made. Those are (1) time spent cleaning and maintaining uniforms and equipment (the second claim); (2) time spent cleaning and maintaining department vehicles (the third claim); (3) time spent before and after shifts on various work-related activities, such as writing reports, reviewing emails, and answering business calls (fourth claim), and (4) time spent on other "off-the-clock" activities performed by officers in "specialty assignments" (the fifth claim).

As to these activities, the plaintiffs claim under what has come to be called the "suffer and permit" rule. To establish a claim for failure to pay overtime compensation for work under 29 U.S.C. § 207(a), the Plaintiffs must demonstrate: (1) that they worked overtime hours without compensation; (2) the amount and extent of the work as a matter of just and reasonable inference; and (3) that the Defendant "suffered" or "permitted" them to work uncompensated overtime. *See* 29 U.S.C. § 203(g); *Lindow v. United States*, 738 F.2d 1057, 1061 (9th Cir. 1984); *Pforr v. Food Lion, Inc*. 851 F.2d 106, 108 (4th Cir. 1987); *see also* 29 C.F.R. § 785.11 ("Work not requested but suffered or permitted is work time.") In the context of 29 U.S.C. § 203(g), the words "suffer" or "permit" means work performed "with the knowledge of the employer." *Fox v. Summit King Mines, Ltd.*, 143 F.2d 926, 932 (9th Cir. 1944).

DOL regulations regarding the "suffer or permit"rule provide as follows:

> The rule is also applicable to work performed away from the premises or the job site, or even at home. If the employer knows or has reason to believe that the work is being performed, he must count the time as hours worked.

29 C.F.R. § 785.12.

> In all such cases it is the duty of the management to exercise its control and see that the work is not performed if it does not want it to be performed. It cannot sit back and accept the benefits without compensating for them. The mere promulgation of a rule against such work is not enough. Management has the power to enforce the rule and must make every effort to do so.

29 C.F.R. § 785.13.

Payment for overtime is addressed in Article 16 of the CBAs. Article 16 of the 2005-07 CBA has been quoted above.

On March 16, 2007 (two days before this action was filed), Chief of Police Gerald R. Whitman issued a department directive regarding overtime in which he stated, "All supervisors and employees are advised that no employee may be asked or expected to work before or after their scheduled shift without receiving compensation for such additional work. The Department does not condone such practices." (Def.'s Ex. A-6.) The Directive reminded employees that "[a]ny supervisor or employee who has knowledge of such a practice taking place has the responsibility of reporting such conduct in accordance with Denver Police Department Operations Manual § 503.1. (*Id.*)

The City contends that this Directive was a reminder of existing policy. The plaintiffs contend that the Directive dated March 16, 2007, signified a policy shift. The Plaintiffs assert that the DPD has had "an ingrained culture of off-the-clock time," fostering expectations that officers would show up for work at least 15 minutes early and discouraging officers from submitting overtime slips in increments of less than 15 minutes. The plaintiffs claim that

supervisors knew that officers were performing substantial amounts of off-the-clock work and permitted that practice to continue.

The papers filed on the summary judgment motions are not sufficient to enable this court to determine these claims. They are dependent on facts and circumstances that depend on evidence to be determined at trial.

The DPD Operations Manual provides, "When the uniform is worn, care shall be taken that it fits well, is neat, clean, in good repair, properly pressed, and that all leather and metal goods are polished." (DPD Ops. Manual § 111.07(1).) Officers are expected to maintain their equipment. The DPD Operations Manual states that the required handgun "shall be clean, properly maintained, and in serviceable condition at all times."

The CBAs for the relevant time period have included an equipment allowance. The 2005-07 CBA states:

> The City shall pay each officer an allowance of $600 for the acquisition, maintenance and repair of equipment. This payment shall be made on or before November 30 of 2005, $650 on or before November 30, 2006, and $700 on or before November 30, 2007.

(Def.'s Ex. A-4, Art. 20.1.) Personal costs associated with the cleaning and maintaining uniforms are considered when the annual equipment allowance is established. The DPD Operations Manual states in § 111.09(1)(e), "The officer's personal expense for tailoring, ties, cleaning, etc. is taken into budget consideration when establishing the annual equipment allowance." (S*ee also* Def.'s Ex. A-8, 2004 Collective Bargaining Negotiations and Impasse Arbitration Transcripts.)

The Plaintiffs argue that the equipment allowance in the CBA between the City and the Denver Police Protective Association is not intended to compensate officers for the *time* they

spend cleaning and maintaining their uniforms and equipment. Whatever may be presented as testimony concerning the intent of the negotiations, the language of the agreement is clear and this claim is precluded. Whether the allowance is adequate is a matter for the Labor Management Committee under Article 7 and the Grievance and Arbitration Procedures in Article 36 of the CBA.

Rules and procedures regarding the care of DPD vehicles are set forth in the § 112 of the DPD Operations Manual. (Def.'s Ex. A-7.) The Operations Manual states that all members of the DPD are responsible for the proper use and care of Department vehicular equipment, and further states that "[c]ases of neglect, alteration or other misuse of equipment shall result in disciplinary action." (*Id.* § 112(1).) Each officer is required to inspect his or her assigned vehicle at the start of each tour of duty. (*Id.* § 112(2).) Officers are required to return their vehicles at the end of their tours of duty with not less than one-half tank of gas. (*Id.* § 112.01(6).) The Operations Manual includes procedures for vehicle preventative maintenance checks, vehicle washing and lubrication, and vehicles in need of repairs. (*Id.* §§ 112.03; 112.04, & 112.05.)

The City has its own facilities for vehicle maintenance and repair work. There is a main Police Garage where mechanics perform major repair work and maintenance. In addition to the main garage, the City maintains a Police Service Center and other facilities around the City, where minor maintenance activities (such as oil changes) are performed by others, and where police vehicles can be washed and vacuumed while the officers are on duty. Washing and vacuuming of DPD vehicles are tasks sometimes performed by trustees from the City Jail.

Some plaintiffs have testified as to reasons they feel compel them to perform this work themselves, particularly those who take home vehicles. This testimony is not sufficient to support a claim that the City suffers or permits this activity in a manner sufficient to establish liability.

The plaintiffs' remaining claims for overtime compensation for off-the-clock work (the fourth and fifth claims) require proof that the plaintiffs worked more than 171 hours in a given 28-day period. The plaintiffs assert that the uncompensated time reported by the representative plaintiffs, together with the work time recorded in the City's payroll records, exceeds 171 hours in at least some 28-day work periods. The plaintiffs have designated Anya King as an expert to testify about her analysis of the City's payroll data. King stated in a declaration that some plaintiffs exceeded the 171-hour threshold in some 28-day periods. The City disputes King's conclusions and criticizes her methodology, particularly with respect to the appropriate treatment of work time designated in the payroll records as time spent in off-duty positions paid through the DPD. The resolution of those factual issues cannot be determined on motions for summary judgment.

In the sixth claim, the plaintiffs claim that the City owes overtime compensation for three categories of "on call" situations: (1) when officers are on call for court; (2) when officers have standby duties as detectives or for other specialty assignments, and (3) when officers have standby duties for supervisory purposes.

Determination of whether the plaintiffs' time spent on call is compensable under the FLSA requires consideration of whether the "time is spent predominantly for the employer's benefit or for the employee's." *Armour & Co. v. Wantock*, 323 U.S. 126, 133 (1944). "[T]he facts

and circumstances of each case should determine whether periods of waiting for work should be compensable under FLSA." *Renfro v. City of Emporia*, 948 F.2d 1529, 1537 (10th Cir. 1991) (citing *Norton v. Worthen Van Service, Inc.*, 839 F.2d 653, 654 (10th Cir.1988)). "[T]he test to determine whether on-call time is compensable 'requires consideration of the agreement between the parties, the nature and extent of the restrictions, the relationship between the services rendered and the on-call time and all surrounding circumstances.'" *Renfro*, 948 F.2d at 1537(quoting *Boehm v. Kansas City Power & Light Co.*, 868 F.2d 1182, 1185 (10th Cir.1989). "[R]esolution of the matter involve[s] determining the degree to which the employee could engage in personal activity while subject to being called." *Renfro*, 948 F.2d at 1537 (quoting *Norton v. Worthen Van Service, Inc.*, 839 F.2d 653, 655 (10th Cir.1988)).

The sixth claim cannot be determined because there is not a clear evidentiary record regarding the circumstances under which officers are assigned to standby duties as detectives, for specialty assignments, and for supervisory purposes. An officer who is placed on call to testify must be available to answer the phone, respond promptly in uniform or business attire, and be sober. Those restrictions are not disputed, but there are questions of fact about whether and to what extent the plaintiffs are able to use on-call time for personal activities.

The plaintiffs also claim that the City has unlawfully delayed the payment of overtime compensation (seventh claim for relief); failed to properly calculate the amount owed for overtime compensation by not including compensation for unused sick leave in the calculation of the "regular rate" of pay (eighth claim for relief); failed to properly calculate the amount of overtime compensation by not including certain categories of "premium" pay in the calculation

of the "regular rate"(ninth claim for relief); and willfully violated § 207(o) of the FLSA by improperly denying plaintiffs the use of compensatory time off (tenth claim).

Damages is the relief sought for each of these claims. To prevail, the plaintiffs must prove that the subject overtime hours qualify as FLSA overtime. That is, the plaintiffs must show that the hours for which compensation is sought were the result of working more than 171 hours in a given 28-day period. Those issues involve evaluation of King's analysis of the City's payroll records. As set forth above, determinations about the reliability of King's methodology cannot be made on motions under Rule 56.

In sum, trial is required for the disposition of the plaintiffs' first, fourth, fifth, sixth, seventh, eighth, ninth, and tenth claims. The plaintiffs have suggested procedures for structuring of subclasses and for the selection of representative plaintiffs. Those suggestions are rejected. The definition of subclasses and procedures for the selection of representative plaintiffs will be the subject of discussion at a planning conference. Subclasses based on duty assignments would be more appropriate than the subclasses presently proposed by the plaintiffs.

Based on the foregoing, it is

ORDERED that the defendant's motion for summary judgment on the plaintiffs' first claim and sixth claims for relief [dkt. 126] is denied; it is

FURTHER ORDERED that the plaintiffs' motion for summary judgment on their first claim for relief [dkt. 125] is granted to the extent discussed; it is

FURTHER ORDERED that the defendant's motion for summary judgment on the second, third, fourth and fifth claims for relief [dkt. 104] is granted in favor of the defendant on

the plaintiffs' second and third claims for relief and denied on the plaintiffs' fourth and fifth

claims for relief.  It is

FURTHER ORDERED that the defendant's motion for summary judgment on plaintiffs'

seventh, eighth, ninth and tenth claims for relief [dkt. 112] is denied; it is

FURTHER ORDERED that the plaintiffs' motion for summary judgment on their

seventh, eighth and ninth claims for relief [dkt. 114] is denied; it is

FURTHER ORDERED that the plaintiffs' motion for summary judgment on their tenth

claim for relief [dkt. 113] is denied; and it is

FURTHER ORDERED that the defendant's motion to strike exhibit 6 and certain

paragraphs of plaintiffs' statement of undisputed facts in plaintiffs' motion for summary

judgment on their tenth claim for relief [dkt. 119] is denied; and it is

FURTHER ORDERED that the Plaintiffs' motion to create subclasses and select

representative plaintiffs [dkt. 105] is denied.

Dated: May 11, 2010

BY THE COURT:

s/Richard P. Matsch

Richard P. Matsch, Senior District Judge