IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Senior District Judge Richard P. Matsch

Civil Action No. 07-cv-00541-RPM

NICK ROGERS,
AL ARCHULETA,
WILFRED BELIVEAU,
HARRY BLOODWORTH,
TIMOTHY DELSORDO,
CORY DUNAHUE,
RUSSELL DYMOND, JR.,
ROBERT FREUND,
MICHAEL GABRIELE,
PAUL GOFF,
ALEXANDER M. GOLSTON,
JEFFREY MARTINEZ,
MICHAEL MOSCO,
PHILLIP NEWTON, and
ANDREW RAMIREZ, et al.,

       Plaintiffs,

v.

CITY AND COUNTY OF DENVER, a Colorado Municipal Corporation,

       Defendant.

---

## FINDINGS OF FACT AND CONCLUSIONS OF LAW AFTER PHASE I TRIAL

---

On May 11, 2010, this Court issued a Memorandum Opinion on Motions for Summary Judgment, granting the Plaintiffs' first claim for relief to the extent that donning and doffing a patrol officer's uniform and equipment for official duty must be considered compensable time and the defendant's motion for summary judgment dismissing the second and third claims for relief for time spent cleaning and maintaining uniforms, equipment and department vehicles. All

other claims in the First Amended Complaint were unadjudicated because they were dependent upon the development of an evidentiary record. In particular, this court said

> The legal issues raised by the parties' motions may be addressed at the conceptual level but it is apparent that disposition will require a trial to resolve factual disputes but also to consider the claims in the full context of the operations of the Denver Police Department ("DPD") during the relevant period and the plaintiffs' contentions regarding the culture of inhibition and intimidation to avoid the statutory and regulatory mandates.

Recognizing that a full trial on all of the claims and defenses would require a large investment of time and expense, the parties agreed to proceed with trial in phases. At a pre-trial conference on October 13, 2010, the parties agreed on a Final Pretrial Order for Phase I which included the following Stipulations:

1. For any claims where there may be a finding of liability on the part of Defendant, the parties agree that the liability period of this lawsuit is from March 19, 2004 (if Defendant's violation is determined to be "willful") or March 19, 2005 (if Defendant's violation is determined not to be "willful") through December 1, 2007. 29 U.S.C. § 255(a) applies.

2. The Denver Police Protective Association ("DPPA") is the exclusive bargaining agent for the bargaining unit comprised of all police officers employed by the Denver Police Department, except the Chief of Police, Deputy Chiefs, Division Chiefs and Commanders.

3. The City and County of Denver and the DPPA entered into Collective Bargaining Agreements covering the time periods 1996-1998, 1999-2001, 2002-2004, 2005-2007, and 2008-2010.

4. Pursuant to the 2002-2004 and 2005-2007 Collective Bargaining Agreements (Article 10.1), members of the bargaining unit received 18 days of paid sick leave each year, and could accrue a maximum of 90 days of sick leave.

5. The general job duties of Denver police officers include protecting life and property, preserving the peace, preventing crime, detecting and arresting violators of the law, enforcing the law, and responding to emergencies. (Defendant's Response to Plaintiffs' First Request for Admission No. 20).

6. The regular job duties of Denver patrol officers include making arrests and issuing traffic citations; assisting with traffic accidents, disabled motorists, and traffic control; participating in community policing efforts; responding to calls for service; and patrolling proactively and becoming acquainted with persons and organizations within the assigned beat. (Defendant's Response to Plaintiffs' First Request for Admission No. 21).

7. The City and County of Denver requires its on-duty patrol officers to be visible and available for citizens who require police assistance. (Defendant's Response to Plaintiffs' First Request for Admission No. 29).

8. The City and County of Denver requires its police offices to check their work email accounts every day that they are on duty. (Defendant's Response to Plaintiffs' First Request for Admission No. 76(d)).

9. The City and County of Denver requires its police officers to complete reports, citations, and other paperwork that documents their law enforcement work. (Defendant's Response to Plaintiffs' First Request for Admission No. 76(h)).

10. The City and County of Denver does not grant a police officer's compensatory time off request if it would require paying overtime to another officer to replace the officer desiring to use compensatory time off. (Defendant's Response to Plaintiffs' First Request for Admission No. 129).

11. The City and County of Denver has the ability to compel police officers to work overtime and believes it has the management right to discipline, up to and including discharge from employment, officers who refuse an order to work overtime. (Defendant's Response to Plaintiffs' First Request for Admission No. 131).

12. Denver Police Department supervisors have discretion to grant or deny requests to use compensatory time off. (Defendant's Response to Plaintiffs' First Request for Admission No. 135).

13. It is a common practice for Denver police officers to check the schedule or talk with their supervisors about staffing levels for a particular day before submitting a written request for compensatory time off on that day. (Defendant's Response to Plaintiffs' First Request for Admission No. 138).

14. The City and County of Denver at times conditions voluntary overtime assignments on an officer's agreement to be compensated in the form of compensatory time off, rather than cash. (Defendant's Response to Plaintiffs' First Request for Admission No. 141).

15. The City and County of Denver requires police officers to follow the Police Department Operations Manual, including all attachments and appendices. (Defendant's Response to Plaintiffs' First Request for Admission No. 150).

16. Denver police officers are subject to reprimand, discharge, reduction in grade, fine and/or suspension for a violation of Denver Police Department rules and regulations. (Defendant's Response to Plaintiffs' First Request for Admission No. 151).

On October 13, 2010, an Order Limiting Issues for Phase I entered, narrowing the scope of evidence to that which may be relevant to the issues identified as (1) the organizational structure of the Denver Police Department (DPD); (2) collective bargaining agreements (CBA) between the City and County of Denver and the Denver Police Protective Association (DPPA); (3) overtime practices and policies of the DPD; (4) payroll practices and policies of the DPD; and (5) compensatory time off practices and policies of the DPD.  Final Pretrial Order for Phase I [Doc. 157].

Evidence was presented at a bench trial on November 1-3, 2010.  Following that trial, the parties filed the following motions:

1.     Plaintiffs' Motion for Summary Judgment on their Tenth Claim for Relief - Unlawful Denial of Compensatory Time Off. [Doc. 170]

2.     Plaintiffs' Motion for Summary Judgment on the Regular Rate Claims [Doc, 172], (Eighth Claim).

3,     Defendant's Renewed Motion for Partial Summary Judgment on Plaintiffs' Eighth and Tenth Claims for Relief. [Doc. 171].

4.     Defendant's Motion for Decertification of Collective Action and to Dismiss Certain Plaintiffs. [Doc. 173].

The filing of these motions was consistent with the expectations expressed in the colloquy with counsel at the conclusion of the three-day trial during which the Court invited

counsel to present their positions as to what issues could now be adjudicated on the evidence presented, including what was submitted in the earlier filed motions for summary judgment. Upon reflection, because the post-trial briefing requires an evaluation of the evidence beyond what is appropriate under Fed.R.Civ.P. 56, these motions are deemed to be requests for Rule 52 findings of fact and conclusions of law after a separate trial on issues under Rule 42(b).

The factual statements in the Memorandum Opinion of May 11, 2010, [Doc. 139] are incorporated by reference in this ruling.

The mission of the Denver Police Department (DPD) includes protecting life and property, preserving the peace, preventing crime, detecting and arresting violators of the law, enforcing the law and responding to emergencies. To perform that mission, the DPD is organized under a command and control structure comparable to the nation's armed services. It is under civilian control of the elected Mayor and City Council acting through the appointed Manager of Safety, and an appointed Chief of Police. During the relevant time period, Gerald Whitman has been the Chief. There have been an average of 1,430 sworn officers appointed under the requirements of the Civil Service Commission, an independent agency, and an average of 250 employees hired under the requirements of the Career Service Authority, an independent agency.

The structure of the command authority of the DPD is set out in Exhibit 4, a copy of which is attached. As shown, operations are conducted under the supervision of the Deputy Chief for Operations, appointed by the Chief and organized in three Divisions: the Patrol Division, the Criminal Investigation Division and the Special Operations Division. The majority of police officers are assigned as uniformed officers in the Patrol Division.

They work in six geographical districts under a Patrol Division Chief and District Commanders. There are some differences among these districts in work assignments because of the needs of the communities they serve. Continuous coverage is achieved by officers working in three shifts with some time overlap. Most shifts, also called "details," are ten hours long with two 15-minute breaks, known as a "short 7" and a 30- minute meal break known as a "long 7." The timing of these breaks depends upon the work being done by the officer who is required to maintain communication with a dispatcher. In some districts the details are 8 hours in duration.

There are four pay grades for police officers according to years of service. They are supervised by Sergeants who report to Lieutenants who report to Captains. Each district has a station house and a number of radio-equipped patrol cars assigned to officers to patrol precincts within the district. There are differences in the size and facilities in the district station houses.

Under the CBA, all officers in the Bargaining Unit, which includes all but the Chief, Deputy Chiefs, Division Chiefs and Commanders, work a 28-day work period with a work cycle of 160 hours, inclusive of authorized leave time, with 8 days off. Shift assignments and schedules in each patrol district are posted in advance of each work period on a "green sheet" which then is used as an attendance record by the shift supervisor, who prepares a "white sheet" showing actual attendance of each officer for the work period. The green sheets include minimum staffing requirements. Off-duty days and vacation time for individual officers are included.

The minimum staffing requirements vary according to anticipated needs and the number of patrol cars available. They are set at the central management level. The patrol officers' work day begins with a roll call conducted by a sergeant at the station house. At roll call, information

relevant to patrol activities is provided and cars are assigned to individual officers. They then collect the necessary equipment in "war bags" which they carry to their cars, inspect the cars and proceed to patrol their precincts.

The sergeants must report to the station house at least 15 minutes before the start of the shift to prepare for roll call and perform administrative duties. Patrol sergeants actively participate in patrol activities, providing on-scene supervision of patrol officers, as needed.

The patrol sergeants are supervised by a lieutenant for each detail. Detail lieutenants have operational responsibility which may include participation in the street duties of the officers. There are some lieutenants assigned to administrative duties at the station house.

Each patrol district has a commander appointed from the ranks of lieutenant or captain and the commander is responsible for the operation and administration of all details in the district.

The plaintiffs' contention that Denver has unlawfully denied requests for compensatory time for overtime in violation of the requirement of FLSA in 29 U.S.C. § 207(o) may be decided on the present record. The City makes a threshold objection that the CBA has provided for overtime when compensable work exceeds 160 hours in the 28-day work period contrasted with the statutory requirement for added compensation after 171 hours and there is nothing in the record to show a failure to compensate for overtime in excess of the statute. That much is true. The reason is the fact that the system in use during the relevant time period was designed and implemented to follow the provisions in the CBA without adequate consideration of the separate requirements of the FLSA and the regulations promulgated by the Department of Labor (DOL). The employer has the statutory duty to keep records required by the DOL. 29 U.S.C. § 211. DOL

regulations require employers to keep records of FLSA overtime hours. 29 C.F.R. § 553.50. The City has not met that obligation.

The Supreme Court addressed the use of compensatory time by public agency employers, permitted by 29 U.S.C. § 207(o) in *Christensen v. Harris County,* 529 U.S. 576 (2000). The Court observed that this provision was added as an amendment to the FLSA in 1985 to mitigate the economic impact of the extension of the FLSA overtime compensation requirements to public-sector employers. After recognizing that the statute requires employers to honor an employee's request to use compensatory time within a reasonable period of time following the request, the Court held that there was no prohibition of a directive compelling the employee to use compensatory time at specified times to avoid accumulation of compensatory hours beyond a set limit.

Public employers may use compensatory time as overtime compensation pursuant to "applicable provisions of a collective bargaining agreement, memorandum of understanding, or any other agreement between the public agency and representatives of such employees." 29 U.S.C. § 207(o)(2)(A)(i). Article 16 of the CBA provides DPD officers with the option of being compensated for overtime in either cash or compensatory time off ("comp time").

The DPD Manual addresses overtime procedures. (*See* Ex. 17, § 505.03; *see also* Ex. 18.) An officer who works overtime must obtain approval for overtime compensation from a supervisor, using a form entitled Overtime Authorization/Accumulated Time Returned (Form 154). (Ex. 41; Tr. Vol. 2, 402:14-25; 403:1-3.) When an officer worked overtime, the overtime hours were recorded on that form. The completed form shows the date and time the overtime

was worked, the reason for the overtime, the supervisor's authorization, and the officer's choice

of compensation (i.e., money or time).

Denver uses a citywide payroll system known as PeopleSoft. During the relevant time

period, Denver's payroll system operated as an "exception pay" system. (Tr. Vol. 2, 390:20-25.)

Under this type of system, it is assumed that each employee worked 40 hours per week, and only

exceptions to this general assumption are entered into the system. (Tr. Vol. 2, 391:1-6; 397-400.)

Exceptions occurred when an employee used any form of leave other than compensatory time

and when the employee worked overtime. (Tr. Vol. 2, 391:7-15; 399:1-12.)

Before December 2, 2007, exception entries were made using a system known as the OSI

system. OSI is an acronym for the Office of Safety Information. (Tr. Vol. 2, 395:17-18;

495:16-25.)

Completed forms (i.e. overtime slips and attendance records) were hand-delivered or sent

by interoffice mail to the Police Department's Human Resources Management Bureau. (Tr. Vol.

2, 403:8-11.) There, the payroll technician (Loretta Woodruff for the period 2004 to 2007)

would enter the exceptions into the OSI system. (Tr. Vol. 2, 453:8-16.) Information recorded in

the OSI system was transferred into the PeopleSoft system, which generated the payroll. (Tr.

Vol. 2, 485:2-6.)

From 1989 to June 2007, Denver tracked officers' accrual and usage of compensatory

time using a separate computer program developed by Detective Glen Miller. (Tr. Vol. 2,

421:3-7.) Detective Miller's program eventually was replaced by a program developed by

Bernadette Lucero. Ms. Lucero's program functioned much like Detective Miller's, only it was

networked and had a different user interface. (Tr. Vol. 2, 542:9-25; 543:1-23.) Neither program

recorded whether overtime hours designated for compensation by time were hours that exceeded the FLSA overtime threshold. (Tr. Vol. 2, 430:4-20.)

Because Denver tracked the accrual and usage of compensatory time off through computer programs that were separate from OSI, overtime work hours for which an officer was compensated by time off are not reflected in the Defendant's payroll records for the relevant period. (Tr. Vol. 3, 566:5-11, Stipulation.)

In December 2007, Denver changed its payroll procedures for recording comp time accrual and usage, and began using a system known as Telestaff to track the accrual and use of comp time. (Tr. Vol. 2, 395:10-11).

29 U.S.C. § 207(o)(5) reads as follows:

(5)     An employee of a public agency which is a State, political subdivision of a State, or an interstate governmental agency–

(A) who has accrued compensatory time off authorized to be provided under paragraph (1), and

(B) who has requested the use of such compensatory time,

shall be permitted by the employee's employer to use such time within a reasonable period after making the request if the use of the compensatory time does not unduly disrupt the operations of the public agency.

29 U.S.C. § 207(o)(5).

Article 16.2 of the CBAs addresses compensatory time. The 2005-07 CBA provides:

After working overtime the officer will designate whether he wants to be compensated in money or time off. If the officer requests compensation in money, that request will be honored, unless a supervisor, for reasonable cause, denies the request. Any such denial is subject to review through the chain of command and ultimately through the grievance procedure of the collective bargaining agreement. If the officer requests compensation in compensatory time off, said request shall be granted, absent extraordinary circumstances, until the officer achieves a bank of eighty (80) hours. If an officer has accumulated a bank of eighty (80) hours or more, then a request for further accrual of compensatory time off must be approved by the Chief or his designee.

Upon request of the officer, compensatory time may be used within a reasonable period after making the request, if the use of the compensatory time does not unduly disrupt the operations of the Department. Under all circumstances, pre-approved vacations take precedence over requests to use compensatory time.

(Ex. 34 at p. 19; *see also* Ex. 35 at p. 23.)

The DPD Operations Manual provides that overtime work may be either "mandatory" or "voluntary." (Ex. 17, § 505.03(4).) When overtime is mandatory, the officer has the choice of being compensated by money or time off. (*Id.* § 505.03(5).) The officer designates his choice (money or time off) on Form 154. (Ex. 41.)

Officers do not have that choice for some voluntary overtime assignments. (Tr. Vol. 1, 60: 2-8.)

The DPD has minimum staffing requirements for each shift (also referred to as a "detail.") The day-to-day staffing requirements vary from District to District and even among the details. (Tr. Vol.1, 107:17-25; 108:1-6.) Minimum staffing requirements depend on factors such time of day, time of year, and the number of patrol cars available to be filled. Chief Whitman testified that minimum staffing requirements are set by looking historically at Department records. (Tr. Vol. 1, 105:13 – 106:12.) The DPD Operations Manual does not address how minimum staffing levels are set for districts or details.

There are times when staffing of a shift falls below minimum staffing. That happens for a variety of reasons, such as when an officer unexpectedly calls in sick or when an officer is away from his or her regular duties for training.

Each shift or detail has a green sheet schedule for each work period. The green sheets show the minimum staffing level for each day. By reviewing the green sheet, DPD officers can see the staffing levels for any particular shift and whether time is available for compensatory leave.

To request compensatory time off, an officer normally submits a written request to the supervising sergeant, using Form 153. (Ex. 39.) Officers also may make verbal requests for compensatory time off on a last-minute basis. (Tr. Vol.1, 203:3-8; Vol.3, 704:10-21.) Under some circumstances, an officer with sufficient seniority may ask for a block of compensatory time off along with vacation time in the "vacation vote" that occurs once a year. (Tr. Vol.3, 780:8-16.)[1]

DPD supervisors have discretion to grant or deny requests to use compensatory time off. The reasons for the denials are not given in writing, and there is no written record of denials of these requests. After denial, the officer must make a new request.

As a general rule, DPD officers are not permitted to utilize comp time to take days off when to do so what put that detail below its minimum staffing requirements. (Vol. 3, 635:9-15; *see also* Ex. 12, § 114.04(09) ("The use of compensatory time must be approved by a supervisor,

---

[1]Vacations are bid in November of each year for the upcoming year and days off are voted work period by work period, on a seniority basis. (Ex. 17.) Under the terms of the CBA, the vacation scheduling takes precedence over comp time requests.

and no detail shall go below minimum staffing levels to accommodate an officer working a department administered overtime assignment.")

The DPD has a written policy that prohibits DPD officers from using compensatory time off "on a regularly scheduled basis for any purpose, including working Secondary Employment." (Ex.17, § 505.03(5)(f) at p. 505-5.) Chief Whitman testified that this policy was enacted after it became known that some officers were leaving their regular shifts early to go work a second job. The purpose of the policy is to ensure than an officer's regular duties are not being affected by the demands of an officer's second job. (Tr. Vol. 1, 111:1-16.)

The DPD prohibits the use of overtime to assign a substitute officer for an officer taking compensatory time off. The DPD Operations Manual provides, "If an officer is authorized to be excused from his normal shift by the use of compensatory time, under no circumstances will premium pay be authorized to back fill the hours the original officer was excused." (Ex 12, § 114.04(10) at p.114-7.) The purpose is to save money.

Mel Thompson, Denver's deputy manager of safety, testified about Denver's budget process. (Tr. Vol.3, 582:8 – 616:4.) Thompson stated that the DPD budget includes an amount for anticipated overtime, but if the Department uses an excessive amount of overtime, then expenditures in other parts of the budget would have to be restricted. He stated, "There's only a limited amount of budget available, so if you eat it up with overtime, then you must cut somewhere else." (*Id.* 590:9-15.) Thompson explained that Denver is required to operate with a balanced budget. (*Id.* 614:7-16.) He said that the majority of Denver's budgets since 2001 have been "reduction" budgets. That is, projected revenues have been below projected expenditures,

requiring reductions in expenditures. (*Id.* 613:9-21.) During the relevant time period, 2004 was a reduction budget and in 2005, Denver began experiencing some growth.[2]

As set forth above, the CBA provides that when an officer requests to use compensatory time, the officer is entitled to the time off "within a reasonable period after making the request, if the use of compensatory time does not unduly disrupt the operations of the Department." (CBA, Art. 16.2.) DOL regulations allow an employer and a labor organization to agree upon what a "reasonable period" means. 29 C.F.R. § 553.25(c). The terms "reasonable period" and "unduly disrupt" are not defined in the CBAs or the DPD Operations Manual.

Section 207(o)(5) requires an employee's receipt of timely compensation for overtime work. The DOL has issued regulations interpreting section 207(o)(5). 29 C.F.R § 553.25 provides:

> (a) Section 7(o)(5) of the FLSA provides that any employee of a public agency who has accrued compensatory time and requested use of this compensatory time, shall be permitted to use such time off within a "reasonable period" after making the request, if such use does not "unduly disrupt" the operations of the agency. This provision, however, does not apply to "other compensatory time" (as defined below in § 553.28), including compensatory time accrued for overtime worked prior to April 15, 1986.

> (b) Compensatory time cannot be used as a means to avoid statutory overtime compensation. An employee has the right to use compensatory time earned and must not be coerced to accept more compensatory time than an employer can realistically and in good faith expect to be able to grant within a reasonable period of his or her making a request for use of such time.

---

[2]Chief Whitman said that 2005 was a strong hiring time for the DPD. (Tr. Vol. 1, 26:21-23.)

(c) Reasonable period.

(1) Whether a request to use compensatory time has been granted within a "reasonable period" will be determined by considering the customary work practices within the agency based on the facts and circumstances in each case. Such practices include, but are not limited to (a) the normal schedule of work, (b) anticipated peak workloads based on past experience, (c) emergency requirements for staff and services, and (d) the availability of qualified substitute staff.

(2) The use of compensatory time in lieu of cash payment for overtime must be pursuant to some form of agreement or understanding between the employer and the employee (or the representative of the employee) reached prior to the performance of the work. (See § 553.23.) To the extent that the conditions under which an employee can take compensatory time off are contained in an agreement or understanding as defined in § 553.23, the terms of such agreement or understanding will govern the meaning of "reasonable period".

(d) Unduly disrupt. When an employer receives a request for compensatory time off, it shall be honored unless to do so would be "unduly disruptive" to the agency's operations. Mere inconvenience to the employer is an insufficient basis for denial of a request for compensatory time off. (See H. Rep. 99-331, p. 23.) For an agency to turn down a request from an employee for compensatory time off requires that it should reasonably and in good faith anticipate that it would impose an unreasonable burden on the agency's ability to provide services of acceptable quality and quantity for the public during the time requested without the use of the employee's services.

In 1994, the DOL issued an Opinion Letter stating, "The fact that overtime may be required of one employee to permit another employee to use compensatory time off would not be a sufficient reason for an employer to claim that the compensatory time off is unduly disruptive." DOL Opinion Letter, 1994 WL 1004861 (Aug. 19, 1994) (provided as Ex. 64.)

Denver's policies and practices are comparable to those of the City of Chicago that were before the Seventh Circuit Court of Appeals in *Heitmann v. City of Chicago*, 560 F.3d 642 (7th Cir. 2009). There the court agreed with the DOL's regulation, holding that under these circumstances it could not say that there was compliance with the statutory requirement that an

employee may use compensatory time off within a reasonable time after a request to take time off. That opinion is persuasive.

There are factual issues concerning the ability of DPD officers to take compensatory time within a reasonable time after requesting it. As previously noted, there is a difference between the accrual of overtime under the CBA and the statute. Whether and to what extent any of the plaintiffs sustained damages because of an unreasonable delay in granting requests for compensatory time will have to be determined upon trial. Whether the delay is justified by undue disruption is also factually dependent. It is, however, appropriate to say that a blanket refusal to incur overtime obligations to officers substituting for those on leave is not sufficient to constitute undue disruption as a justification for extending time to the extent that it becomes unreasonable. It must be remembered that the policy of the FLSA is the protection of the welfare of workers and that the use of compensatory time in lieu of cash payment is limited to public employers. The DOL is specific in prohibiting the required use of compensatory time that the employer cannot realistically expect to grant as a means to avoid paying statutory overtime compensation.

The parties dispute the manner in which Denver complies with the requirement that overtime pay must be at a rate not less than "time and one-half the regular rate of pay." 29 U.S.C. § 207(a)(1).

The FLSA defines "regular rate" to include "all remuneration for employment paid to, or on behalf of, the employee," except eight categories of payments, compensation, income and other sums described in subsections (e)(1) through (8). 29 U.S.C. § 207(e). The eight exceptions are:

(1)    payments that are gifts or bonuses (section 207(e)(1));

(2)    payments made for occasional periods when no work is performed due to vacation, holiday, illness, failure of the employer to provide sufficient work, or reimbursement of expenses (section 207(e)(2));

(3)    payments that are completely within the employer's discretion (section 207(e)(3));

(4)    contributions to retirement or insurance plans (section 207(e)(4));

(5 -7)  premium compensation paid for overtime work (section 207(e)(5)-(7)), and

(8)    income from stock programs (section 207(e)(8)).

The Plaintiffs claim that Denver failed to include four categories of compensation – pay for accumulated sick leave, acting pay, hazardous duty pay, and bilingual pay in calculating the regular rate.

The sick leave pay issue has been resolved by the decision of the Tenth Circuit Court of Appeals in *Chavez v. City of Albuquerque*, 630 F.3d 1300 (10th Cir. 2011). Unused sick leave must be included in determining the regular rate of pay.

Acting pay is the extra pay that an officer receives when temporarily assigned to work in a higher job classification. Acting pay is addressed in Article 21 of the CBAs. The 2005-07 CBA provides:

> Any officer who, for a period of four (4) hours or more, is temporarily assigned by his superior to a rank higher than that which the officer currently holds and assumes the duties of that higher rank shall be compensated at the hourly rate of pay of the higher rank for the entire duty shift in which he or she is so assigned. If during the period of temporary assignment, the officer also works overtime as defined by Article 16 of this Agreement, the officer shall be paid overtime as provided by Article 16.

(Ex. 34 at p. 25; see also Ex. 35 at p. 29.)

Bilingual pay is extra compensation officers receive for bilingual abilities.  Bilingual pay is addressed in Article 27 of the CBAs.  Bilingual officers receive extra pay of either $100 to $200 per month, depending upon their certification.

Hazardous duty pay is extra compensation for assignments such as bomb technician, helicopter pilot, and motorcycle duty.  Hazardous duty pay is addressed in Article 27 of the CBAs.

Under the 2002-04 CBA, an officer's hourly rate was determined by dividing an officer's "base pay" (defined as the sum total of an officer's annual salary and longevity pay) by two thousand eighty (2,080) hours.  (Ex. 35, Art. 2 and Art. 16.4.)  The 2002-04 CBA provided that "the overtime pay shall be at time and one-half an officer's base rate."  (*Id.* Art. 16.2.)  In short, until 2004, Denver determined the overtime rate by using an officer's "base rate," which included only salary and longevity pay.

Sergeant Michael Mosco testified that in 2004 – during the negotiations for the 2005-07 CBA – the DPPA communicated its position that under the FLSA, the extra compensation officers receive for hazardous duty pay, bilingual pay, accumulated sick leave pay and acting pay must be included in officers' regular rates, for the purpose of determining their overtime rates. (Tr. Vol. 3, 627:12 – 628:8.)

Denver agreed that hazardous duty pay and bilingual pay should be included in the regular rate.  Accordingly, Articles 2 and 16 of the 2005-07 CBA changed the definition.

Article 16.2 of 2005-07 CBA provides, "the overtime rate is time and one-half of the officer's regular rate of pay."  (Ex. 34 at p. 19, emphasis added.)  Article 2 of the 2005-07 CBA, defines "regular rate of pay" as "the sum total of an officer's base pay (defined as the sum total of

an officer's annual salary plus the longevity calculation) . . . , plus any regularly recurring remunerations the officer may be receiving under Article 27 of this Agreement, divided by two thousand eighty (2,080) hours." (Ex. 34, at p. 3.) The regularly recurring remunerations listed in Article 27 include compensation received for hazardous duty assignments and for bilingual abilities. (Ex. 34 at pp. 3 and 32.)

In 2004, Denver made retroactive overtime payments to compensate officers who had been underpaid as a result of Denver's failure to include bilingual pay and hazardous duty pay in the hourly rate used to compute their overtime rates. (Tr. Vol. 2, 386:10 – 387:2.) Denver changed its payroll procedures to include bilingual pay and hazardous duty pay in the regular rate. (*Id.*) Denver does not include compensation for accumulated sick leave or acting pay in the regular rate, when computing the Plaintiffs' overtime rates.

Acting pay is granted for the entire shift during which the officer is performing duties of a higher pay grade for at least four hours. It exceeds the hourly rate. While it is not within the eight statutory exceptions, the obligation to pay the higher rate arises only under the CBA and it expressly agreed than any hours of overtime worked on such temporary assignment would be paid under the provisions of Article 16 – the officer's pay grade. Therefore acting pay is not included in the regular rate of pay.

These rulings on the regular rate of pay must be applied in determining the plaintiffs' claims that Denver improperly calculated the amounts due for accrued compensatory leave time upon separation from employment. When computing an officer's rate for the purpose of cashing out unused compensatory time off paid to an officer upon separation from employment, the

FLSA requires that compensation for accumulated sick leave, bilingual pay and hazardous duty pay be included in the regular rate.

The City renewed its motion for summary judgment on the regular rate of pay claim and the denial of requests for compensatory leave. That motion is denied for the reasons discussed.

The defendant also moved for decertification of this collective action and dismissal of claims made by officers holding the rank of sergeant and above on the ground that they are exempt as executive or administrative employees under 29 U.S.C. § 213(a). The evidence presented on the organization of the DPD and the assignment of officers to the positions within the Districts, Divisions and Bureaus leads to the conclusion that the pay grades established in the CBA are not determinative of the duties and responsibilities of the officers holding those grades in their assignments during the relevant time. Those duties and responsibilities will in turn, determine the applicability of the exceptions. The burden of proof is on the City and the present record is not sufficient for making the necessary findings.

The motion to decertify this as a collective action makes no persuasive argument. It is denied.

There are significant differences between the work practices and requirements of the officers assigned to the Patrol Division and the other divisions and bureaus. Those differences may require evidence beyond what has been presented in Phase I and the findings and conclusions now being made are not necessarily applicable. For example, the daily activities of detectives in criminal investigation do not follow the routines of patrol officers and the allowance of compensatory time may be different. Some consideration should be given to a division of the plaintiffs into sub-classes according to their assignments as this case goes forward.

Accordingly it is,

ORDERED, that the parties' motions for summary judgment are deemed motions for findings and conclusions on the separate issues presented and the rulings made will govern the further trial proceedings necessary for full adjudication of the claims and defenses, and it is

FURTHER ORDERED that the defendant's motion for decertification of collective action and to dismiss with prejudice certain plaintiffs [173] is denied.

DATED:  April 15, 2011

BY THE COURT:

Richard P. Matsch, Senior District Judge

Rogers, et al. v. City and County of Denver, et al.
DEF000281

**DENVER POLICE DEPARTMENT OPERATIONS MANUAL**

ORG - 19

Plaintiffs' Exhibit 4; Stipulated
Civil Action No. 07-cv-00541-RPM

**Chief of Police**
- Support Staff

**Deputy Chief Operations**

Patrol Division
- Nuisance Abatement Unit
- Patrol Support Bureau
- METRO/SWAT Bureau
- Gang Bureau
- District Six
- District Five
- District Four
- District Three
- District Two
- District One

Criminal Investigation Division
- Crimes Against Persons Bureau
- Pattern Crimes Bureau
- Crime Laboratory Bureau
- Vice/Drug Control Bureau
- C.I.D. Support Bureau

Special Operations Division
- Traffic Investigations Bureau
- Traffic Operations Bureau
- Airport Bureau
- Juvenile Bureau
- Executive Security

Intelligence Bureau

**Deputy Chief Administration**

Technology & Support Division
- Property Bureau
- Communications Bureau
- Training Bureau
- Records & ID Bureau
- Crime Analysis Bureau
- Support

Financial Services Bureau
- Administration Support Bureau
- Research & Development Bureau
- Human Resource Management Bureau
- Office of Emergency Management
- Urban Areas Security Initiative Training

Internal Affairs Bureau
- Legislative Unit
- Public Affairs Unit

REV. 2-06

Rogers, et al. v. City and
County of Denver, et al.
DEF000282



Rogers, et al. v. City and
County of Denver, et al.

DEF000283

**ORG - 21**

Jul 295



**Deputy Chief Administration**

- Technology & Support Division
- Administration Support Bureau
- Financial Services Bureau
- Human Resource Management Bureau
  - Limited Duty Section
  - Secondary Employment
  - Public Safety Cadet Coordinator
- Research & Development Bureau

Rogers, et al. v. City and
County of Denver, et al.
DEF000284

EXHIBIT 296



Rogers, et al. v. City and
County of Denver, et al.
DEF000285



Rogers, et al. v. City and
County of Denver, et al.
DEF000286



Rogers, et al. v. City and
County of Denver, et al.

°•° in 299



### SPECIAL OPERATIONS DIVISION

- Special Operations Support Staff

- **Traffic Operations Bureau**
  - Traffic Services Section - Detail 1
    - Accident Cars
    - City Enforcement Motorcycles
    - Highway/Hazmat Unit
    - Selective Enforcement Unit
  - Traffic Services Section - Detail 2
    - Accident Cars
    - City Enforcement Motorcycles
    - Highway/Hazmat Unit
  - Highway / DUI DRE Unit Detail #3
  - Special Events Unit
    - Neighborhood Enforcement Team NET
    - Photo Enforcement Unit
    - Traffic Safety Unit
  - Headquarters Security Unit

- **Juvenile Bureau**
  - Juvenile Intake Unit

- **Executive Security Unit**

- **D.I.A. Airport Bureau**
  - Details 1, 2, 3
  - Airport Canine Explosives Detection Unit
  - Motorcycle Enforcement Unit
  - Investigations Unit
  - Overtime Unit

- **Traffic Investigation Bureau**

Rogers, et al. v. City and
County of Denver, et al.
DENVER POLICE DEPARTMENT OPERATIONS MANUAL

ORG - 26

JUL 300



DENVER POLICE DEPARTMENT OPERATIONS MANUAL

County of Denver, et. al.,
Rogers, et al. v. City and
DEF0000289

ORG - 27

ORG - 301



Rogers, et al. v. City and
County of Denver, et al.
DEF000373

Denver Police Department Organizational Chart

**Chief of Police**
- Support Staff

**Deputy Chief Operations**

Patrol Division
- District One
- District Two
- District Three
- District Four
- District Five
- District Six
- Gang Bureau
- METRO/SWAT Bureau
- Patrol Support Bureau
- Nuisance Abatement Unit

Criminal Investigation Division
- Crimes Against Persons Bureau
- Patrol Crimes Bureau
- Crime Laboratory Bureau
- Vice/Drug Control Bureau
- C.I.D. Support Bureau

Special Operations Division
- Traffic Investigations Bureau
- Traffic Operations Bureau
- Airport Bureau
- Juvenile Bureau
- Executive Security

Intelligence Bureau
- Crime Analysis Bureau

**Deputy Chief Administration**

Technology & Support Division
- Property Bureau
- Training Bureau
- Records & I.D. Bureau
- Support

Administration Support Bureau
- Financial Services Bureau
- Research & Development Bureau
- Human Resource Management Bureau
- Office of Emergency Management
- Urban Area Security Initiative Liaison
- Volunteers in Policing

Internal Affairs Bureau
- Legislative Unit
- Public Affairs Unit

Rogers, et al. v. City and
County of Denver, et al.
DEF000374



Rogers, et al. v. City and
County of Denver, et al.
DEF000375

```
                                                    +------------------+
                                                    | Deputy Chief     |
                                                    | Operations       |
                                                    +------------------+
                                                          |
          +-----------+-----------+-----------+-----------+-----------+
          |           |           |           |           |
  +-------------+ +----------+ +----------+ +----------+ +----------+
  | Intelligence| | Patrol   | | Criminal | | Special  | | Crime    |
  | Bureau      | | Division | |Investiga-| |Operations| | Analysis |
  +-------------+ +----------+ | tion     | | Division | | Bureau   |
                               | Division | +----------+ +----------+
                               +----------+                   |
                                                         +----------+
                                                         | C.O.R.E. |
                                                         +----------+

                                    +-------------+
                                    | Support Staff|
                                    +-------------+
```

Rogers, et al. v. City and
County of Denver, et al.
DEF000376

Rogers, et al. v. City and
County of Denver, et al.
DEF000377

06



Rogers, et al. v. City and
County of Denver, et al.
DEF000378



Rogers, et al. v. City and
County of Denver, et al.
DEF000379



SPECIAL OPERATIONS
DIVISION

Special Operations
Support Staff

Traffic
Investigations
Bureau

Juvenile Bureau

Traffic Operations
Bureau

Executive Security
Unit

D.I.A.
Airport Bureau

Juvenile Intake
Unit

Headquarters
Security Unit

Special Events
Unit

Neighborhood
Enforcement Team
NET

Photo
Enforcement
Unit

Traffic
Safety Unit

Traffic Services
Section - Detail 1

Traffic Services
Section - Detail 2

Highway / DIA
DRE Unit Detail #3

Details
1, 2, 3

Airport Canine
Explosives
Detection Unit

Motorcycle
Enforcement Unit

Investigations Unit

Overtime Unit

Accident Cars

City Enforcement
Motorcycles

Highway/Hazmat
Unit

Selective
Enforcement Unit

Accident Cars

City Enforcement
Motorcycles

Highway/Hazmat
Unit

Rogers, et al. v. City and
County of Denver, et al.
DEF000380



DEF000381

Rogers, et al. v. City and
County of Denver, et al.

